UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

JOHN WILLIAM HENDERSON,

        Petitioner,

v.

STATE OF MINNESOTA,

        Respondent.

Civil File No. 03-6507 (MJD/FLN)

**REPORT AND RECOMMENDATION**

John William Henderson, Minnesota Correctional Facility – Lino Lakes, 7525 4th Avenue, Lino Lakes, Minnesota, 55014, Petitioner, pro se.

Donna J. Wolfson, Assistant Hennepin County Attorney, C-2000 Government Center, Minneapolis, Minnesota, 55487, for Respondent.

THIS MATTER is before the undersigned United States Magistrate Judge on Petitioner's application for habeas corpus relief under 28 U.S.C. § 2254.  (Docket No. 1.) Respondent has filed a return contending that the petition should be denied.  (Docket Nos. 5-12.)  The matter has been referred to this Court for report and recommendation under 28 U.S.C. § 636 and Local Rule 72.1(c).  For the reasons discussed below, it is recommended that the petition for writ of habeas corpus be denied, and that this action be dismissed with prejudice.

## I.     BACKGROUND

Petitioner is presently serving a 91-month state prison sentence at the Minnesota Correctional Facility at Lino Lakes, Minnesota.  His sentence was imposed by the state district court for Hennepin County, Minnesota, after a jury in that court found him guilty of first degree criminal sexual conduct involving a seven-year old girl.  He was convicted and sentenced in early 2001.

In the mid-1990s, Petitioner became reacquainted with a woman named Veronica, who he had first met as a child.  Petitioner and Veronica developed a romantic relationship, and Veronica and her two children from her second marriage moved into Petitioner's home. The youngest of Veronica's children was a daughter named Victoria.  Sometime in late July or early August of 1999, when Victoria was seven years old, Veronica noticed some unusual behavior by Victoria, which prompted Veronica to ask her daughter some questions.  Victoria then told her mother that she had been sexually abused by Petitioner. By using paper cutout figures representing Petitioner and herself, Victoria explained to her mother that Petitioner had forced her to perform oral sex.  Victoria accused Petitioner of putting his penis into her mouth on several occasions during the past nine months or so.

Veronica did not confront Petitioner immediately after she first heard Victoria's accusations.  However, she did sleep near Victoria thereafter (at least on some nights), and she later took Victoria to California.  When Veronica and Victoria returned from California around the beginning of September 1999, they went back to Petitioner's home.  A few days later, however, a neighbor approached Veronica and said that Victoria had been telling other children that Petitioner had abused her.  Later that day, Veronica finally confronted Petitioner with Victoria's accusations.  Petitioner denied the accusations, and claimed that he had never abused Victoria.

At roughly the same time, Victoria was visiting her father, Mike Peterson, who was Veronica's second husband.  Two of Victoria's half-sisters – Mike Peterson's twin teen-age daughters from a marriage prior to his marriage to Veronica – were also visiting.  Victoria told her two half-sisters what Petitioner had done to her, and they in turn told their father. Peterson then called Veronica to find out what she knew about Victoria's accusations.

2

(Trial Transcript, [Docket Nos. 6-10], [hereafter "Tr."], at 392.)

Later that evening, Petitioner came over to Mike Peterson's home and tried to explain to him that he had never abused Victoria. There is some dispute about the nature of the conversation between the two men. Petitioner claims he tried to persuade Peterson that Victoria was not telling the truth, and that they should try to figure out some way to "deal[ ] with the situation." (Tr. 579.) Petitioner later told Veronica that Peterson was "asking for money instead of dealing with the issue at hand." (Tr. 581.) Peterson denied that he was interested in getting money from Petitioner to resolve his daughter's accusations. (Tr. 399; 645.) Peterson says that he simply told Petitioner to "get out of here." (Tr. 644.)

Peterson later talked to his mother about Victoria's accusations, and then contacted someone from a local child protection agency. (Tr. 393.) A police detective was assigned to investigate the matter, and he made arrangements to have Victoria taken to a facility known as "CornerHouse" to be interviewed.

The CornerHouse interview was conducted by Anne Nuernberg, a social worker who had previously done between 1600 and 1800 interviews with children. (Tr. 333.) (The CornerHouse Interview was videotaped, and a transcript of the interview, [hereafter "CI"]. is included in the present record at the end of Volume II of the Trial Transcript, [Docket No. 7].) During the CornerHouse interview, Victoria repeated her allegation that Petitioner had put his "thing" in her mouth. (CI at 12.) She said that he did it at his house "at Christmas," which apparently meant sometime in December 1998. (CI at 13.) She said there were other occasions when he did the same thing to her, including once when she had chicken pox. (CI at 15.)

3

Victoria also said during the CornerHouse interview that when Petitioner forced her to perform oral sex, he smoked a cigar, and he blew cigar smoke into her mouth. (CI at 14.) At one point she said, "one time he put his thing in my mouth, he put it way back here and then I almost was gonna throw up." (CI at 16.) Victoria also told the CornerHouse interviewer that on at least one occasion when Petitioner molested her, he was watching "dirty TV stuff" with naked adults. (CI at 23.) She said it felt "icky" when Petitioner put his penis in her mouth, and she always brushed her teeth after he did that. (CI at 14, 26.)

After the CornerHouse interview, the police obtained a search warrant and searched Petitioner's house and car. They found no cigars, but they did find adult videos and drug paraphernalia used for smoking marijuana and crack cocaine. (Tr. 464-66, 657-58.) Petitioner was then arrested and charged with first degree criminal sexual conduct.

Petitioner's trial was delayed for more than two years, primarily due to Petitioner's medical treatment for cancer. When the case was set for trial in September 2001, Petitioner was granted a continuance so he could retain new counsel. At about that time, the prosecutor discovered, during the course of her preparations for trial, that Victoria had claimed that she had been sexually molested by the boyfriend of her mother's sister. Victoria indicated that the boyfriend had reached inside her underwear and put his finger into her vagina while she was alone with him in his bedroom.

After that accusation was disclosed to the prosecutor, the police began a separate investigation into that matter. The prosecutor met with the trial court judge, ex parte, and told him what she had learned, but neither Petitioner nor his counsel were informed about Victoria's new accusations. However, by the time Petitioner's case was finally ready for trial in January of 2002, Petitioner's new attorney had learned about the new allegations

4

against Victoria's aunt's boyfriend.

Shortly before the trial was scheduled to begin, Petitioner brought a motion seeking permission to introduce evidence regarding Victoria's new sex abuse allegations. Petitioner argued that the new allegations were false, and that he should be allowed to present evidence regarding those allegations, because they purportedly suggested that Victoria might have developed a pattern of making false sex abuse accusations. The prosecution opposed the motion, contending that the evidence Petitioner wanted to present to the jury was inadmissible under Minnesota's "rape shield" statute, Minn.Stat. § 609.347, subd. 3. According to the prosecution, Minnesota caselaw bars evidence of the type that Petitioner sought to introduce, (i.e., evidence pertaining to other sex abuse allegations by the victim), unless there is sufficient proof that the other allegations are in fact false.

The trial court judge conducted a lengthy hearing on Petitioner's motion, which included testimony by the accused boyfriend and Victoria's aunt. Both of them refuted Victoria's allegations. (Tr. 167, 185.) The judge also reviewed some written reports that had been generated by law enforcement officials during the course of their ongoing investigation into Victoria's allegations against the aunt's boyfriend.

After considering the relevant evidence, the trial court judge filed a written decision that denied Petitioner's request to introduce evidence pertaining to Victoria's allegations against her aunt's boyfriend. (A copy of that decision is attached to the "State's Answer to Petition For Writ Of Habeas Corpus," [Docket No. 5], as Appendix, [hereafter "Appx."], pp. 23-25.) The judge found that "both the testimony of [Victoria] (by interview record and by videotape) and the testimony of [the boyfriend] is convincing" and "[b]oth have the style, manner and demeanor of truth tellers." (Appx. p. 24.) The judge further noted that the

5

boyfriend's denials of Victoria's accusation were "emphatic and he seems genuinely startled that the accusation is made."  (Appx. p. 24.)  He further noted, however, that "[t]here appears to be no bad blood between [Victoria and the boyfriend] which would give [Victoria] a motive to lie."  (Appx. pp. 24-25.)

The judge ultimately concluded that Petitioner was unable to establish that it was "reasonably probable" that Victoria's accusations against the boyfriend were indeed false. (Appx. p. 25.)  He therefore ruled that the evidence pertaining to those accusations could not be introduced at Petitioner's trial.

Petitioner also sought to introduce testimony from a proposed "expert witness" named Stanley Slowik, who had reviewed and critiqued the videotape of the CornerHouse interview.[1]  Petitioner wanted to try to show the jury that Anne Nuernberg, the CornerHouse interviewer, had not used appropriate interviewing techniques, and may have misled or confused Victoria.  Petitioner obviously hoped to convince the jury that Victoria's testimony during the CornerHouse interview was not reliable.  After considering the arguments of counsel and relevant Minnesota state court caselaw, the trial judge concluded that Petitioner's proposed expert should not be allowed to testify about the interviewing techniques used by the CornerHouse interviewer.  (Appx. pp. 14-15.)

In January 2002, Petitioner's case finally was tried before a jury.  Victoria testified at trial and told the jury that Petitioner had put his penis into her mouth on more than one occasion when she was six or seven years old.  (Tr. 280-82.)  The State also presented

---

[1]  A written report submitted by Petitioner's proposed expert is included in the present record as an attachment to Petitioner's memorandum in support of his petition, (Docket No. 2), identified as "Appendix," at pp. 10-15.

testimony from Victoria's mother and two half-sisters, as well as the videotape of the CornerHouse interview.  That evidence tended to corroborate Victoria's testimony by showing that she had repeated essentially the same accusation against Petitioner on multiple occasions.

Petitioner also testified at his trial, and categorically denied Victoria's accusations. (Tr. 562.)  Petitioner tried to convince the jury that Victoria's father, Mike Peterson, had induced Victoria to falsely accuse Petitioner of sex abuse, with the hope that he (Peterson) could somehow use Victoria's accusation to extort a large sum of money from Petitioner. In an effort to defuse that defense theory, the prosecutor attempted to show that Petitioner did not have enough money to make extortion worthwhile.  Over Petitioner's objections, the prosecutor was allowed to ask him whether his home was "mortgaged to the hilt" and whether his business (a limousine service) was "not in good standing."  (Tr. 598.)  After Petitioner denied those allegations, the prosecutor attempted to introduce various documents that purportedly would have shown that Petitioner had received a foreclosure notice on his home, and that his business had not retained its good standing with the Minnesota Secretary of State.  (Tr.  709-10.) However, the trial judge ruled that the prosecutor would not be allowed to introduce such evidence.  (Tr. 723-24.)

After the jurors began their deliberations, they asked if they could watch the videotape of the CornerHouse interview.  The trial court judge allowed the jury to watch the videotape again, but the jury also was required to listen to a reading of the transcript from Petitioner's direct examination.  (Tr. 882.)  Later that same afternoon, the jury returned a guilty verdict against Petitioner.  A few weeks thereafter, Petitioner was sentenced to 91 months in state prison.

7

Following his conviction and sentence, Petitioner filed a direct appeal that raised a number of claims, most of which challenged the trial court's application of Minnesota state law to various evidentiary and discovery issues that arose before and during Petitioner's trial.  The claims raised in Petitioner's direct appeal that are relevant here are as follows:

(1) that his proposed expert should have been allowed to testify about the CornerHouse interview techniques;

(2) that he should have been allowed to present evidence regarding Victoria's allegedly false accusations against her aunt's boyfriend;

(3) that the prosecution should not have been allowed to ask him questions about his financial situation; and

(4) that the prosecution violated the rules governing discovery by failing to produce certain evidentiary materials before trial.

The Court of Appeals rejected all of Petitioner's claims on direct appeal and upheld his conviction and sentence.  <u>State v. Henderson</u>, C5-02-780 (Minn.App. 2003), 2003 WL 21005327 (unpublished opinion).   The Minnesota Supreme Court denied Petitioner's application for further review on July 15, 2003.  (Appx. 11.)

Petitioner now seeks federal habeas corpus relief based on the four claims from his direct appeal that are listed above.  However, Petitioner now contends that his claims are based on federal constitutional principles, (in particular, his Fourteenth Amendment right to due process), and not merely Minnesota state law.  For the reasons discussed below, the Court finds that Petitioner is not entitled to a writ of habeas corpus on any of his current claims for relief.

## II.    STANDARD OF REVIEW

28 U.S.C. § 2254(d), which was enacted as part of the Anti-terrorism and Effective

Death Penalty Act, ("AEDPA"), prescribes the standard of review for federal habeas corpus

proceedings.

> "In the habeas setting, a federal court is bound by the AEDPA to exercise only limited and deferential review of underlying state court decisions. 28 U.S.C. § 2254; Williams v. Taylor, 529 U.S. 362, 402-13,... (2000). Accordingly, 'habeas relief 'shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless' the state court's decision was 'contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States,' or 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.''"

Jones v. Luebbers, 359 F.3d 1005, 1011 (8th Cir. 2004), pet. for cert. filed, October 8, 2004,

quoting Robinson v. Crist, 278 F.3d 862, 865 (8th Cir.2002) (quoting 28 U.S.C. § 2254(d)).

Federal habeas review of state court judgments is available only for federal

constitutional issues.  The United States Supreme Court has repeatedly held that "it is not

the province of a federal habeas court to reexamine state-court determinations on state-law

questions.  In conducting habeas review, a federal court is limited to deciding whether a

conviction violated the Constitution, law or treaties of the United States."  Estelle v.

McGuire, 502 U.S. 62, 67 (1991).  See also Wainwright v. Goode, 464 U.S. 78, 83 (1983)

(per curiam) ("[i]t is axiomatic that federal courts may intervene in the state judicial process

only to correct wrongs of a constitutional dimension").

It is also well-established that a state prisoner cannot raise any federal constitutional

claim for the first time in his federal habeas corpus petition; a federal constitutional claim

is reviewable in a federal habeas corpus proceeding only if that claim has already been

fairly presented to, and decided on the merits by, the highest available state court.

O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999) ("[b]ecause the exhaustion doctrine is designed to give the state courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal courts,... state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process").

A habeas petitioner does not have to spell out every nuance of his constitutional claims to the state courts, but he does have to give the state courts fair notice that there is indeed a federal constitutional dimension to his claims.  As explained by the Supreme Court, "[i]f state courts are to be given the opportunity to correct alleged violations of prisoners' federal rights, they must surely be alerted to the fact that the prisoners are asserting claims under the United States Constitution."  Duncan v. Henry, 513 U.S. 364, 365-66 (1995) (per curiam).

"Even if state law 'bears some relation to' federal constitutional requirements, 'habeas petitioners must have explicitly cited to the United States Constitution or federal case law in their direct [state court] appeal to preserve federal review.'"  Morris v. Norris, 83 F.3d 268, 270 (8th Cir. 1996), quoting Luton v. Grandison, 44 F.3d 626, 628 (8th Cir. 1994), cert. denied, 513 U.S. 1195 (1995).  See also McCall v. Benson, 114 F.3d 754, 757 (8th Cir. 1997) ("[m]ere similarity between the state claims and the federal  habeas claims is insufficient").  Therefore, "[i]f a habeas petitioner wishes to claim that an evidentiary ruling at a state court trial denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal court, but in state court."  Duncan, 513 U.S. at 366.

In this case, it appears that Petitioner did not fairly present the federal constitutional dimension of his current claims for relief in the Minnesota state courts.  This Court has carefully scoured the Minnesota Court of Appeals' decision in Petitioner's case, which is the last complete state court decision,[2] and finds no direct or indirect reference to the Constitution itself, to any specific constitutional Amendment, or to any clearly identifiable constitutional terminology, (e.g., "due process").  To the contrary, it clearly appears that the state courts decided Petitioner's claims based solely on state law principles, without ever specifically considering whether there was any constitutional dimension to any of those claims.

If Petitioner had raised any constitutional issues in his direct appeal, the State Court of Appeals presumably would have addressed them.  The fact that the Court of Appeals' decision makes no mention of any federal constitutional principle clearly suggests that Petitioner's direct appeal did not specifically challenge the constitutionality of any of the trial court's rulings.  If Respondent had addressed this point, (as directed by the Court's Order to Show Cause, [Docket No. 3]), it appears that all of Petitioner's current constitutional claims would have to be summarily dismissed under the doctrine of procedural default. See  McCall, 114 F.3d at 757 ("before we may reach the merits of a habeas petition, we must first determine whether the petitioner has fairly presented his federal constitutional claims to the state court") (emphasis added).[3]

_____

[2]  The Minnesota Supreme Court's ruling on Petitioner's subsequent application for further review is merely a one-sentence summary denial.  (Appx. 11.)

[3]  See also Flieger v. Delo, 16 F.3d 878, 887 (8th Cir.) ("Whether or not [the habeas petitioner] objected at trial to the admission of this evidence, it is clear that he failed to claim in the state courts that the alleged evidentiary violations amounted to denials of his federal

However, Respondent has not argued procedural default in this matter.  To the contrary, Respondent has effectively waived Petitioner's procedural default by stating that "Petitioner's claims have been exhausted in state court."  ("State's Answer To Petition For Writ Of Habeas Corpus," at p. 2.)  Therefore, the federal constitutional claims that Petitioner is now raising (for the first time) must be addressed on the merits, even though it appears that those claims were procedurally defaulted.  See Robinson, 278 F.3d at 865 ("because the state failed to advance a procedural default argument, such argument is waived"), citing Ford v. Norris, 67 F.3d 162, 165 (8th Cir. 1995).

Reviewing Petitioner's current constitutional claims on the merits, however, is somewhat problematic.  The Court cannot apply the normal deferential standard of review to the state courts' rulings, (see p. 9, supra), because the state courts never actually addressed and decided Petitioner's current constitutional claims.  While this problem is unusual, it is not unprecedented.  The Eighth Circuit Court of Appeals has suggested that when a district court is confronted with the situation presented here, (i.e., when a federal court is asked to review constitutional claims that were not previously adjudicated in the state courts), it is best to review the claims independently, under pre-AEDPA standards.  Robinson, 278 F.3d at 865 (where state prisoner's habeas claim "apparently was not adjudicated by the Minnesota [state] court, we likely should apply the pre-AEDPA standard of review"); Clemons v. Luebbers, 381 F.3d 744, 755 (8th Cir. 2004) (same).

---

due process rights. Because the state courts never had the opportunity to consider both the factual and legal bases for Flieger's federal due process claims,... [citation omitted], they are procedurally defaulted."), cert. denied, 513 U.S. 946 (1994).

Thus, instead of applying the highly deferential standard of review prescribed by §

2254(d), the Court will review Petitioner's current habeas corpus claims under the less

stringent standards that were in effect before AEDPA was enacted.  Those standards are

discussed in greater detail below.

### III.    DISCUSSION

A.  Petitioner's Evidentiary Claims

Three of Petitioner's four current claims for relief pertain to rulings by the trial court

on the admissibility of certain pieces of evidence.  Petitioner claims that the trial court erred

by (1) not allowing his proposed expert, Stanley Slowik, to testify about the propriety of the

interviewing techniques used during the CornerHouse interview, (2) barring all evidence

pertaining to Victoria's accusations against her aunt's boyfriend, and (3) allowing the

prosecution to introduce evidence regarding Petitioner's financial situation.  Petitioner now

contends that the trial court's rulings on these three matters not only misapplied state law,

but also deprived him of his constitutional right to due process, because he was not allowed

to confront his accusers and present evidence in support of his defense.

"Questions relating to the admissibility of evidence are matters of state law and are

generally not cognizable in an action for habeas corpus."  Wood v. Lockhart, 809 F.2d 457,

459 (8th Cir. 1987), citing Maggitt v. Wyrick, 533 F.2d 383, 385 (8th Cir.), cert. denied, 429

U.S. 898 (1976).  "In order for the admission of evidence to warrant habeas relief, the trial

court's error must have been so egregious that it denied the defendant his right to due

process."  Mercer v. Armontrout, 844 F.2d 582, 587 (8th Cir.), cert. denied, 488 U.S. 900

(1988).  See also Bailey v. Lockhart, 46 F.3d 49, 50 (8th Cir. 1995) ("[a] state court's

evidentiary ruling is a matter of state law, and we may examine the ruling in a habeas

proceeding only to determine whether the asserted error denied due process").

"To establish a due process violation warranting federal habeas relief, [a petitioner] must prove that the error was 'so gross'... 'conspicuously prejudicial'... or otherwise of such magnitude that it fatally infected the trial and failed to afford [the petitioner] the fundamental fairness which is the essence of due process." Kerr v. Caspari, 956 F.2d 788, 789 (8th Cir. 1992), quoting Rainer v. Department of Corrections, 914 F.2d 1067, 1072 (8th Cir. 1990), cert. denied, 498 U.S. 1099 (1991). See also Bounds v. Delo, 151 F.3d 1116, 1119 (8th Cir. 1998) (same). "In making this determination courts must review the totality of the facts in the case pending before them and analyze the fairness of the particular trial under consideration." Ellis v. Black, 732 F.2d 650, 658 (8th Cir. 1984). See also Mercer, 844 F.2d at 582 (to determine whether the admission of disputed evidence deprived a habeas petitioner of due process, the court must "look at the totality of the circumstances").

"It is well established that the Fourteenth Amendment, along with the Sixth Amendment, guarantee criminal defendants the opportunity to present a complete defense, including the right to present relevant testimony." Boysiewick v. Schirro, 179 F.3d 616, 620 (8th Cir. 1999), cert. denied, 528 U.S. 1141 (2000).

> "However, 'the right to present relevant testimony is not without limitation. The right may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process.'... [Citations omitted.] Such legitimate interests include the traditional concerns of prejudice and issue and jury confusion, as well as the protection of rape victims from harassment and unnecessary invasions of privacy."

Id.

A habeas petitioner who claims that a state court evidentiary ruling violated his federal constitutional rights faces a very heavy burden of persuasion. "'To carry that

burden, the petitioner must show that there is a reasonable probability that the error complained of affected the outcome of the trial – i.e., that absent the alleged impropriety the verdict <u>probably</u> would have been different.'" <u>Gee v. Groose</u>, 110 F.3d 1346, 1350 (8th Cir. 1997) (emphasis added), quoting <u>Anderson v. Goeke</u>, 44 F.3d 675, 679 (8th Cir. 1995). <u>See</u> <u>also</u>, <u>Harris v. Bowersox</u>, 184 F.3d 744, 752 (8th Cir. 1999) (same), <u>cert</u>. <u>denied</u>, 528 U.S. 1097 (2000).

Needless to say, it is not easy for a habeas petitioner to affirmatively demonstrate that some particular evidentiary ruling, by itself, <u>probably</u> made the difference between conviction and acquittal.  It is therefore not surprising that "[r]ulings on the admission or exclusion of evidence in state trials rarely rise to the level of a federal constitutional violation." <u>Nebinger v. Ault</u>, 208 F.3d 695, 697 (8th Cir. 2000).  Indeed, Petitioner has not cited, and this Court has not independently located, a single case in which the Eighth Circuit actually reversed a state criminal conviction on a due process claim challenging a trial court's ruling on an isolated evidentiary issue.

Again, a federal court cannot attempt to determine whether the evidence at issue should have been admitted or excluded under the state rules of evidence and caselaw. The only issue that a federal court can properly consider in a habeas corpus proceeding is whether the state trial court's evidentiary ruling was so "egregious," "gross" and "conspicuously prejudicial" that it effectively deprived the petitioner of his federal constitutional rights.  Here, based on a review of the state court record as a whole, the Court cannot conclude that the evidentiary rulings challenged by Petitioner were unconstitutional.

### (i)  Exclusion of evidence of another accusation

Perhaps the most significant of the three evidentiary issues raised by Petitioner is the exclusion of the evidence regarding Victoria's accusation against her aunt's boyfriend. If Petitioner had been able to persuade the jury that Victoria had, in fact, falsely accused the boyfriend of sexually assaulting her, then the jury might have been more inclined to question Victoria's veracity.

It cannot simply be assumed, however, that the jury actually would have found Victoria's accusation against the aunt's boyfriend to be false.  Indeed, the trial court judge excluded that accusation evidence because he found, after conducting a pre-trial evidentiary hearing, that Petitioner was unable to establish that it was "reasonably probable" that the accusation actually was false.  (Appx. p. 25.)  The Minnesota Court of Appeals agreed with that determination.  Henderson, 2003 WL 21005327 at *1 ("given the uncertainty and confusion surrounding the accusation, we cannot say the district court erred by refusing to admit direct or cross-examination testimony concerning [Victoria's] prior accusation of sexual misconduct by her aunt's boyfriend because [Petitioner] did not establish to a reasonable probability that the prior accusation of sexual misconduct was false").  The trial court judge was in the best position to evaluate Victoria's accusation against her aunt's boyfriend.  Given his uncertainty about the truthfulness of that accusation, and the state appellate court's concurrence on the matter, this Court is unable to conclude that a jury probably would have found those accusations to be untrue.

Furthermore, even if the jury had heard and disbelieved Victoria's accusation against her aunt's boyfriend, it does not necessarily follow that the jury would have disbelieved Victoria's testimony against Petitioner.  The jury might have reasoned that a young girl like

Victoria would be more capable of fabricating an allegation of sexual abuse if she had actually experienced such abuse in her past.  If the jury had followed that line of reasoning, then Victoria's accusation against the aunt's boyfriend might have been more incriminating than exculpatory, even if the jury did not find the subsequent accusation itself to actually be truthful.  For this additional reason, the Court does not find the evidence at issue to be overwhelming, verdict-altering, proof of Petitioner's innocence.

Although the evidence in this case was not completely one-sided, the prosecution certainly did present a strong case.  Victoria's trial testimony, combined with the videotape of the CornerHouse interview, provided credible and compelling evidence of Petitioner's guilt.  That evidence was corroborated by the testimony from Victoria's mother and two half-sisters.  Looking at the record as a whole, this Court cannot conclude that Petitioner probably would have been acquitted if the jury had been allowed to consider evidence regarding Victoria's accusation against her aunt's boyfriend.  Therefore, the Court cannot conclude that the exclusion of such evidence violated Petitioner's constitutional rights.

### (ii) Exclusion of Petitioner's proposed expert witness

Petitioner also contends that he was deprived of his constitutional rights when the trial court ruled that he could not present testimony by Stanley Slowik, which would have questioned the propriety of the interviewing techniques used by Anne Nuernberg during the CornerHouse interview.  Slowik presumably would have suggested to the jury that Nuernberg had confused or misled Victoria, and that Victoria's statements during the CornerHouse interview were therefore unreliable.

It is certainly arguable that Slowik's expected testimony could have aided Petitioner's defense, but that does not necessarily mean that the exclusion of such testimony violated

Petitioner's constitutional rights.  As discussed above, a defendant's constitutional right to present evidence in support of his defense "is not without limitation."  <u>Boysiewick</u>, 179 F.3d at 620.  In this case, the trial court determined, and the state appellate court agreed, that –

> "the expert testimony proffered by [Petitioner] was likely to mislead or confuse the jury.  By attacking the interviewing techniques used by the interviewer, [Petitioner's] expert would have implicitly asserted that [Victoria] was not telling the truth.  And credibility determinations are ordinarily within the province of the jury."

<u>Henderson</u>, 2003 WL 21005327 at * 3.

This Court agrees with the state courts' evaluation of the proposed expert witness testimony – i.e., that it could have confused the jurors and improperly tainted their own independent assessment of Victoria's credibility.  As the state courts pointed out, the assessment of a witness's credibility is one of the most critical duties that a jury performs, and it is a duty that our judicial system normally entrusts to the jury alone.  In this case, Petitioner wanted to influence <u>how</u> the jury performed its duty to assess a witness's credibility, and the state courts were properly concerned about such meddling in the province of the jury.[4]

Furthermore, Petitioner's expectation that Slowik actually would have persuaded the jury that Victoria was lying is pure speculation.  Petitioner has not adequately demonstrated

---

[4] The Court recognizes that it is common and proper for litigants to try to persuade a jury that a particular witness is credible or not credible.  The primary purpose of "impeachment evidence," of course, is to cast doubt on the credibility of a particular witness, by showing the witness's memory or veracity to be flawed.  In this case, however, Petitioner did not seek to directly impeach Victoria's memory or veracity <u>per se</u>; instead he tried to attack the manner in which she was questioned during the CornerHouse interview. The state courts understandably found that to be a dubious tactic, which would interfere with the jury's exclusive responsibility for making credibility determinations.

that the jury's verdict probably would have been different if Slowik had testified at Petitioner's trial.  If the trial court erred at all by excluding the proposed Slowik testimony, (which is doubtful), that error was not so grievous and far-reaching that it probably changed the outcome of the trial and deprived Petitioner of his constitutional right to due process.  Therefore, Petitioner is not entitled to a writ of habeas corpus based on the exclusion of Slowik's testimony.

### (iii) Admission of evidence regarding Petitioner's financial status

Petitioner's third evidentiary claim challenges the admissibility of evidence pertaining to his financial status.  Petitioner complains that "there is certainly a reasonable possibility that the jury's credibility determination was improperly influenced by inaccurate evidence and innuendo portraying Petitioner as financially bankrupt and out of business." (Petitioner's Memorandum In Support Of Petition, [Docket No. 2], p. 17.)  This argument must be rejected for several reasons.

First, the evidence pertaining to Petitioner's financial status was not intended to cast doubt on his overall credibility; it was intended merely to cast doubt on the viability of his extortion theory, (i.e., his theory that Victoria was persuaded to falsely accuse him so that her father could extort money from him).  Petitioner has failed to explain why he believes there is a "reasonable possibility" that the jury's assessment of his credibility was affected by evidence pertaining to his financial circumstances.  He apparently assumes that juries automatically find richer people to be more credible than poorer people, but the Court finds no reason to accept that assumption.

Furthermore, the evidence pertaining to Petitioner's financial situation was not very weighty or significant.  At most, it appears that the jury may have been led to believe that

19

Petitioner's home was heavily mortgaged, and that he had not filed certain reports with the Secretary of State in recent years.  It is doubtful that such meager evidence would have made the jury think that Petitioner was impoverished, and it is even more doubtful that such evidence would have made the jury think he was untruthful.

Finally, even Petitioner himself acknowledges that there is, at most, only a "reasonable possibility" that the evidence pertaining to his financial situation influenced the jury's assessment of his credibility.  It certainly cannot be said that the admission of the evidence at issue <u>probably</u> altered the outcome of the trial in this case.  Therefore, Petitioner has not shown that the jury's exposure to such evidence violated his federal constitutional rights.

B.  <u>Petitioner's "Discovery" Claim</u>

In his final claim for relief, Petitioner contends that his constitutional rights were violated because the prosecution did not disclose certain evidence to him during the course of the pre-trial discovery process.  Petitioner's memorandum in support of his petition, (Docket No. 2, pp. 18-19), identifies four specific pieces of information that allegedly were not properly disclosed by the prosecution: (1) Victoria's accusations against her aunt's boyfriend; (2) a statement by Victoria's mother, which purportedly suggested that Victoria's maternal grandfather had abused his daughters; (3) a claim by Victoria's father that Petitioner had allegedly suggested that they, (i.e., Petitioner and Victoria's father), should "take care of things themselves;" and (4) the evidence pertaining to Petitioner's financial affairs that has already been discussed above.

The principal defect in Petitioner's so-called "discovery" claim is that it obviously is based on Minnesota's <u>state</u> rules of criminal procedure, and not the federal Constitution.

20

Petitioner contends that "[t]he rules require disclosure of all evidence that is 'related to the case' regardless of whether it is exculpatory or meets standards for admissibility at trial." (Petitioner's Memorandum In Support Of Petition, [Docket No. 2], p. 20.)  Even if that is an accurate summary of Minnesota's state rules, it clearly is <u>not</u> an accurate description of the federal constitutional principles governing the prosecution's responsibility to disclose evidence before trial.

The federal Constitution's disclosure requirements, which emanate from <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), obligate prosecutors to provide <u>exculpatory</u> evidence to defendants.   "[T]he prosecutor's absolute duty to disclose under <u>Brady</u> is limited to evidence a reasonable prosecutor would perceive at the time as being <u>material and favorable to the defense</u>." <u>Villasana v. Wilhoit</u>, 368 F.3d 976, 979 (8th Cir. 2004) (emphasis added).  Evidence that has "neither exculpatory or impeachment value" is "outside the scope of <u>Brady</u>'s absolute duty to disclose." <u>Id</u>.

In order to prevail on a <u>Brady</u> duty-to-disclose claim, Petitioner must first identify some specific evidence that was known to the prosecution before his trial, but did not become known to him until after the trial.  <u>United States v. Gonzales</u>, 90 F.3d 1363, 1368 (8th Cir. 1996).  In addition, Petitioner must show that there is a "reasonable probability" that the outcome of the trial would have been different, if the exculpatory evidence in question had been disclosed to the defense before or during the trial. <u>Kyles v. Whitley</u>, 514 U.S. 419, 434 (1995), citing <u>United States v. Bagley</u>, 473 U.S. 667, 678 (1985).

In this case, two of the four pieces of evidence mentioned in Petitioner's "discovery" claim – i.e., (1) the evidence pertaining to his financial situation, and (2) the statement by Victoria's father indicating that Petitioner had said, in effect, 'we can take care of this by

ourselves' – are not material and favorable to the defense.  There is nothing exculpatory in either of those two items.  Indeed, Petitioner has specifically claimed that the financial evidence at issue was so incriminating that it was a violation of his constitutional rights to allow the jury to hear any of it.[5]  Any evidence suggesting that Petitioner wanted to "take care of this ourselves" is certainly more incriminating than exculpatory, because it implies that Petitioner was trying to suppress Victoria's accusations before the truth became known and the police became involved.  Because the financial evidence and the "cover up" evidence are actually inculpatory rather than exculpatory, Petitioner cannot sustain a Brady claim based on either of those two matters.  See Gonzales, 90 F.3d at 1368 ("Brady does not require the government to disclose inculpatory evidence").

Petitioner has also failed to show that any evidence pertaining to Victoria's grandfather might have been exculpatory and therefore covered by Brady's disclosure requirements.  If Petitioner is suggesting that perhaps it was the grandfather who molested Victoria, rather than Petitioner himself, he has offered nothing to support that theory. Petitioner has not provided any reason to believe that (a) the grandfather had access to Victoria, (b) the grandfather actually molested Victoria, or (c) that Victoria had any reason to accuse Petitioner instead of the grandfather.  In fact, Petitioner has not even shown that the grandfather was alive at any time relevant to this case.  Because Petitioner has failed to show that any information pertaining to Victoria's grandfather was truly exculpatory, he

---

[5] Furthermore, any information pertaining to Petitioner's financial affairs presumably was as accessible to Petitioner as it was to the prosecution.  For this additional reason, the prosecution had no Brady obligation to disclose such information to Petitioner.  Gonzales, 90 F.3d at 1368 ("the government need not disclose evidence available to the defense from other sources or evidence already possessed by the defendants").

cannot sustain a <u>Brady</u> claim based on that information.

The only other matter cited in Petitioner's "discovery" claim is Victoria's accusation against her aunt's boyfriend.   Petitioner cannot sustain a <u>Brady</u> claim based on that evidence, because it was fully disclosed to him, and he had a chance to seek permission to introduce it to the jury, <u>before</u> the trial began.   <u>See</u> <u>Gonzales</u>, 90 F.3d at 1368 ("in this Circuit, the rule of <u>Brady</u> is limited only to the discovery, <u>after trial</u>, of information which had been known to the prosecution but unknown to the defense....[;] [w]here the prosecution delays disclosure of evidence, but the evidence is nonetheless disclosed during trial, <u>Brady</u> is not violated") (emphasis added).

In sum, Petitioner has not come close to showing that the prosecutor violated the <u>federal constitutional</u> disclosure requirements prescribed by <u>Brady</u>.   Therefore, Petitioner is not entitled to a writ of habeas corpus on his fourth claim for relief.

## IV.    RECOMMENDATION

Based upon the foregoing and all of the files, records, and proceedings herein,

**IT IS HEREBY RECOMMENDED THAT:**

1.  Petitioner's application for a writ of habeas corpus, (Docket No. 1), be **DENIED**; and

2.  This action be **DISMISSED WITH PREJUDICE**.

DATED: November <u>10</u>, 2004

s/ Franklin L. Noel
FRANKLIN L. NOEL
United States Magistrate Judge

Under D.Minn. L. 72.1(c)(2) any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by November 29, 2004, a writing which specifically identifies those portions of this Report to which objections are made and the

basis of those objections.  Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.  A party may respond to the objecting party's brief within ten days after service thereof.  All briefs filed under this rule shall be limited to ten pages.  A judge shall make a de novo determination of those portions to which objection is made.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable directly to the Court of Appeals.